**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| J.S., A MINOR BY HIS PARENTS, M.S. AND D.S., | : | No. 2 MAP 2021 |
| | : | |
| | : | Appeal from the Order of the |
| Appellees | : | Commonwealth Court dated May 13, |
| | : | 2020 at No. 341 CD 2019 affirming |
| | : | the Order of the Lancaster County |
| v. | : | Court of Common Pleas, Civil |
| | : | Division, dated February 25, 2019 at |
| | : | No. CI-18-04246. |
| MANHEIM TOWNSHIP SCHOOL | : | |
| DISTRICT, | : | ARGUED:  May 18, 2021 |
| | : | |
| Appellant | : | |

**OPINION**

**JUSTICE TODD**                                    **DECIDED:  November 17, 2021**

This discretionary appeal lies at the crossroads of student free speech rights under the First Amendment and the duty of public schools to maintain a safe, effective, and efficient educational environment.  Specifically, we review the determination of Appellant Manheim Township School District ("School District") that one of its students, Appellee J.S., made terroristic threats to another student through social media – outside of the school day and off school property – substantially disrupting the school environment, and leading to his expulsion.  We allowed appeal to consider whether the School District denied J.S. due process during the expulsion process and to consider the proper standard by which to determine whether J.S. engaged in threatening speech unprotected under

the First Amendment of the United States Constitution,[1] or created a substantial disruption of the school environment. For the reasons that follow, we determine that J.S. did not engage in unprotected speech, and did not cause a substantial disruption to the school environment. Therefore, we conclude that the School District improperly expelled J.S. and affirm the order of the Commonwealth Court.

The facts underlying this appeal are largely undisputed. At the relevant times, J.S. was a student in the School District, which is located outside of Lancaster, Pennsylvania. Over a period of 10 days, in early April 2018, J.S. and another student ("Student One") engaged in various conversations on social media, with each participant using a private cell phone in his respective home. During the conversations, the participants made fun of another classmate ("Student Two"), suggesting he looked like a school shooter. Specifically at issue, on April 10, 2018, J.S. sent Student One two "Snapchat memes."[2] [3] In one meme, J.S. and Student One joked that Student Two looked like a school shooter, ostensibly because of his long hair and penchant for wearing a "Cannibal Corpse" tee shirt. Cannibal Corpse is a musical band whose genre is death metal rock and whose

---

[1] U.S. Const. amend. I. As this matter arose only under the First Amendment, we do not consider a student's speech rights under the Pennsylvania Constitution's analogous provision. See Pa. Const. art. I, § 7 ("The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak . . . on any subject, being responsible for the abuse of that liberty.").

[2] While the School District's adjudication notes a third meme, it is not relied upon by the School District before us.

[3] Snapchat is a social media application for smartphones that allows users to send private text messages, photographs, and video messages to other users. Goldman v. Breitbart News Network, LLC, 302 F. Supp. 3d 585, 586 n.1 (S.D.N.Y. 2018). A communication sent by Snapchat is called a "snap." These messages are limited in duration, cannot be accessed from the web, and can only be viewed temporarily. As of April 10, 2018, the Snapchat conversation between J.S. and Student One entailed approximately 20 messages and 5 images. Two of the images were "memes." A meme is a photo or video image with caption superimposed on the image by the one sending the meme. Trial Court Opinion, 2/25/2019, at 2 n.3. Memes are often used for humor and political commentary.

songs use violent lyrics and graphic imagery drawn from horror fiction and films. *See* https://en.wikipedia.org/wiki/Cannibal_Corpse. Cannibal Corpse's lyrics and album artwork frequently feature transgressive and macabre imagery, including depictions of extreme violence and gore. *Id.*

The first meme contained a still photograph of Student Two singing into a microphone and was captioned as follows: "I'm shooting up the school this week. I can't take it anymore I'm DONE!" Administration Exhibit 1 to Expulsion Hearing, 5/3/18. At the bottom of the meme is a photo-shopped image of J.S. wearing large "Elton John" glasses, seemingly watching Student Two's performance. The response of Student One to this meme was "LOL," which means "laughing out loud."

J.S. then created a short video meme. This video meme depicted Student Two playing guitar music into a microphone and was captioned as follows: "IM READY [Student One] AND MANY MORE WILL PERISH IN THIS STORM. I WILL TRY TO TAKE [Student One] ALIVE AND TIE HIM UP AND EAT HIM." Administration Exhibit 3 to Expulsion Hearing, 5/3/18. The meme attributed the quote to Student Two, who was singing lyrics akin to those by Cannibal Corpse. Notably, the lyrics of the band's songs include references to eating children.

While the memes were originally private, Student One subsequently posted the first meme to his personal Snapchat "story," where it could be viewed by Student One's Snapchat "friends." In this way, it was available for approximately five minutes and seen by 20 to 40 other students. Student One had not shared any of the other messages between him and J.S. over the prior 10 days. Student One direct-messaged J.S., informing him that he (Student One) had posted the first meme. Once J.S. learned what Student One had done, he asked Student One to remove the meme from his Snapchat story. Student One did so, stating on his Snapchat story that it was a "[p]robable false

alarm, just something [J.S.] sent me." Administration Exhibit 6 to Expulsion Hearing, 5/3/18. Student Two did not receive any of the Snapchat communications.

Another student reported the meme to his parent, who was employed by the School District. The parent did not call 911, the police, or the school administrator, but texted the meme to the School District's High School Principal. In turn, the Principal contacted the School District Assistant Superintendent and the police. In the early morning of April 11, 2018, the police arrived at J.S.'s home and interviewed both J.S. and his parents about the meme Student One had posted on his Snapchat story. The police concluded that there was no threat to school safety, that school could still be held later that day, and reported their conclusions to the School District. Nevertheless, the superintendent sent an e-mail to all parents and teachers stating that there had been a threat posted on social media, but that, after investigation, the school and campus were deemed safe.

Thereafter, the High School administration interviewed J.S. and his parents. J.S. explained that he intended his on-line conversation with Student One to be funny and to remain private. Initially, the School District suspended J.S., and conducted interviews of Student One and Student Two as part of its investigation. On April 12, 2018, the School District suspended J.S. for three days for violating the School District's policy against terroristic threats. Manheim Township School District Policy No. 218.2 ("Terroristic Threats/Acts Policy"), Administration Exhibit 4 to Expulsion Hearing, 5/3/18.[4] The policy

_____

[4] The Terroristic Threats/Acts Policy states in relevant part:

> Purpose
>
> The Board recognizes the danger that terroristic threats and acts by students present to the safety and welfare of district students, staff, and community. The Board acknowledges the need for an immediate and effective response to a situation involving such a threat or act.

defines "[t]erroristic threat" as "a threat to commit violence communicated with the intent to terrorize another . . . or to cause serious public inconvenience, in reckless disregard of the risk of causing such terror or inconvenience." *Id.* Four days later, on April 16, 2018, after the School District obtained the video meme, it increased J.S.'s suspension to 10 days for violating its policy against cyberbullying. Manheim Township School District Policy No. 249 ("Cyberbullying Policy"), Administration Exhibit 5 to Expulsion Hearing, 5/3/18. That policy states that the School District will provide "a safe, positive learning environment for district students" and that in this environment "bullying and harassment in any form is not tolerated." *Id.* The policy defines "[b]ullying" as an "intentional electronic, written, verbal or physical act or series of acts" "[d]irected at another student or students" that "occurs in a school setting." *Id.* Further, it defines the "[s]chool setting" as school grounds, school vehicles, designated bus stops, and school sponsored activities or "use of school-owned communications devices, networks or equipment." *Id.* No disciplinary actions were levied against Student One. The next day, the School District notified J.S. and his parents of a formal hearing to consider expelling J.S. for violating the school's terrorism and bullying policies.

---

Definitions

Terroristic threat - shall mean a threat to commit violence communicated with the intent to terrorize another; to cause evacuation of a building; or to cause serious public inconvenience, in reckless disregard of the risk of causing such terror or inconvenience.

Terroristic act - shall mean an offense against property or an endangerment to another person.

Authority

The Board prohibits any district student from communicating terroristic threats or communicating terroristic acts directed at any student, employee, Board member, community member or school building.

Manheim Township School District Policy No. 218.2.

On May 3, 2018, a hearing on the charges was held before three members of the school board. Prior to the hearing, J.S.'s parents attempted to obtain the presence of Student One, but the School District declined to compel his attendance, asserting that it lacked subpoena power. At the hearing, the School District introduced testimony of its attorney, over J.S.'s hearsay objection, that Student One told High School administrators that he had felt terrorized by the two memes and had publicized the "I can't take it anymore" meme to alert others to a possible threat. Student One, however, never reported any concern to his parents, police, or school administrators about the content of J.S.'s snapchats or memes. Nevertheless, based upon the two memes which J.S. sent to Student One, on May 11, 2018, the three-member committee of the school board recommended that J.S. be permanently expelled for making terroristic threats and engaging in cyber-bullying against another through social media. The school board ratified the Committee's recommendation. J.S. appealed the adjudication to the Lancaster County Court of Common Pleas, arguing that he was denied due process because he was not able to confront Student One during the hearing and that the School District's determinations were not supported by substantial evidence.

Judge Leonard G. Brown, III, in a thorough and thoughtful opinion, sustained J.S.'s appeal, concluding that J.S. was denied due process and that the School District's conclusions were not supported by substantial evidence. Specifically, with respect to J.S.'s due process challenge, the trial court explained that, although the legislature did not grant the school board subpoena power in expulsion hearings, the Department of Education granted several rights to students facing expulsion, including "the right to request that the witnesses appear in person and answer questions or be cross-examined." 22 Pa. Code. § 12.8(b)(6). Noting that the right to cross-examine under Section 12.8(b)(6) is granted specifically with respect to witnesses whose testimony,

statements, and affidavits the School District relied upon to establish the offenses charged and to justify expulsion, the trial court found that Student One certainly was the type of witness to whom the right to cross-examine would apply. Thus, the court concluded that the failure of Student One to testify and be subject to cross-examination – even though not the fault of the School District given its asserted lack of subpoena power – violated J.S.'s constitutional right to due process.

Second, the trial court found that the School District's adjudication was not supported by substantial evidence, which it found to be intertwined with the question of whether any violation of the First Amendment occurred by the School District in rendering its decision. In reaching this conclusion, the court preliminarily observed that there was no case law which clearly sets forth the standard as to how a school board or reviewing court is to analyze a situation such as the one herein. Relying, in part, upon *J.S. v. Bethlehem Area School District*, 807 A.2d 847 (Pa. 2002) (hereinafter "*Bethlehem Area School District")* (requiring an objective analysis as to whether speech constitutes a true threat), and *Commonwealth v. Knox*, 190 A.3d 1146 (Pa. 2018) (requiring, *inter alia*, the subjective intent of the speaker to be considered in determining whether the speech at issue constitutes a true threat), the court bifurcated its analysis. First, the court considered whether the speech at issue was protected by the First Amendment, including whether the communication constituted a "true threat."[5] It then analyzed whether the speech could be prohibited consistent with the First Amendment because it created a substantial disruption to the school environment.

_____

[5] While the trial court did not specifically define the concept of "true threat," as set forth below, a true threat is communication that a speaker intended to be a serious expression of an intent to inflict harm, *i.e.*, intended to intimidate or threaten the recipient of the message. As discussed below, true threats are not protected speech under the First Amendment, and, thus, are subject to regulation and punishment.

In evaluating the first question — whether the speech was protected by the First Amendment — the court initially considered the location of the speech to determine whether the School District had the authority to regulate and punish it. While the court found that a policy prohibiting terroristic threats is both reasonable and necessary, the court emphasized that the statute enabling the School District to make such rules limits the School District's authority regulating speech occurring while the students are under the supervision of the school. 24 P.S. § 5-510.[6] The trial court reasoned that, here, even assuming the memes constituted unprotected true threats, none of the activity involving the memes occurred on school property or during such time as the students were under the school's supervision; thus, the court suggested that the School District's remedy was limited to reporting the memes to the police, which it did.

Nevertheless, noting that J.S.'s statement regarding "shooting up the school" could be construed as advocating violence towards or within a school, *i.e.*, supplying a nexus to the school, the court reasoned that the proximity requirement articulated in *Bethlehem Area School District* might not be applicable to speech of that nature. The court suggested that, instead, in order to punish speech of such character, a school must both show that "the speech caused a substantial disruption or could reasonably be expected to cause such a disruption and engage in a true threat analysis." Trial Court Opinion, 2/25/2019, at 29 (citing *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969)).

As to the substantial disruption issue, the trial court, however, questioned whether *Tinker*'s geographic proximity and substantial disruption standard was even applicable in

---

[6] This provision allows a school district to, *inter alia*, adopt and enforce rules "regarding the conduct and deportment of all pupils attending the public schools in the district, during such time as they are under the supervision of the board of school directors and teachers, including the time necessarily spent in coming to and returning from school." 24 P.S. § 5-510.

this matter, opining that restricting speech on grounds of student safety was appropriate, and constituted an exception to the general prohibition of restrictions on student speech. The court found it "untenable in the wake of Columbine, Jonesboro, Sandy Hook, and Lakeland that any reasonable school official who came into possession of J.S.'s memes would not have taken some action based on their disturbing content," and, thus, was of the view that *Tinker*'s substantial disruption test (at least requiring geographic proximity to the school) did not apply. *Id.* at 31.

The trial court proceeded to engage in a true threat analysis under *Knox*. First, the court looked to the Terroristic Threats/Acts Policy noted above, and determined that the only question was whether J.S. communicated a threat to commit violence to Student One, with the intent to terrorize him.[7] Turning to whether J.S. intended to terrorize, the trial court noted that true threats are not protected under the First Amendment. The court offered that, while rejecting an objective test, the *Knox* Court pointed to *Bethlehem Area School District* for its contextual analysis.

Specifically, the trial court explained that the School District made no specific finding that J.S. intended the meme to terrorize Student One, but, rather, that it concluded that J.S.'s memes constituted terroristic threats, viewed objectively. As intent was central to the definition of terroristic threat in the Terroristic Threats/Acts Policy, the court found that the School District failed to establish a violation of the policy. However, the trial court continued and considered, consistent with *Knox*, the following contextual factors: (1) whether the statement was an "actual threat" versus "political hyperbole;" (2) whether the full context of the discussion was one that "often involves inexact and abusive language;"

---

[7] The court did not consider the aspect of the policy prohibiting acts committed with reckless disregard of the risk of terrorizing, as there were no findings or conclusions by the School District as to whether J.S. acted with such reckless disregard. Trial Court Opinion, 2/25/2019, at 32.

(3) whether the threat was conditional; (4) whether it was communicated directly to the victim; (5) whether the victim had reason to believe the speaker had a propensity to engage in violence; and (6) how the listeners reacted to the speech. *Id.* at 33.

While the School District did not analyze these factors, the trial court addressed them. The court concluded that the memes, as part of a discussion between immature high school boys, were not political hyperbole, and, in reaching that conclusion, considered J.S.'s assertion that the memes were a joke. The court continued, finding that use of Snapchat, in which messages disappeared after a short time unless saved, fostered inane communication. The court also deemed important the fact that the picture was of Student Two wearing a t-shirt displaying a musical band whose lyrics celebrated cannibalism. The court found the language used in the memes were not conditional by their terms, but were conditional in that they concerned Student Two's actions to shoot up the school and to eat Student One, and not what J.S. intended to do. As Student One did not testify, the court found it impossible to discern his beliefs regarding J.S.'s propensity to engage in violence. As to the reaction of the "victim," Student One, the trial court offered that, while he did not testify, Student One posted the one meme to his Snapchat story and that, while the School District contended this was to inform people of threatening behavior, there was nothing in the record to support Student One's intention in doing so. Furthermore, once J.S. asked him to take the meme down, Student One did so within five minutes, stating, "Probable false alarm, just something J.S. sent me." Administration Exhibit 6 to Expulsion Hearing, 5/3/18. Moreover, the trial court noted that Student One did not report the memes to the police, his parents, a teacher, a principal, a guidance counselor, or school administrator, and did not tell J.S. to stop sending him messages; rather, Student One responded "LOL." As noted by the trial court, there was no evidence presented by the School District that Student One was fearful, other than the

School District's attorney's hearsay assertion that Student One was terrorized, a statement objected to and which the court determined could not be relied upon for a finding of fact.

Ultimately, applying *Knox*, the trial court concluded that the School District's decision was not supported by substantial evidence for the primary reason that, as a student could be held responsible under the Terroristic Threats/Acts Policy only when the threat was communicated with the intent to terrorize, or with reckless disregard of terrorizing, and the School District produced no such evidence. Thus, the court sustained J.S.'s appeal of the terroristic threats adjudication, and ordered that his expulsion be expunged.[8]

On appeal, a three-judge panel of the Commonwealth Court affirmed. Writing for the court, Judge Mary Hannah Leavitt, after reciting the facts and issues on appeal, determined that the matter had been "ably resolved in the thorough and well-reasoned opinion" of Judge Brown, and affirmed on the basis of his opinion. *J.S. v. Manheim Township School District*, 231 A.3d 1044, 1048 (Pa. Cmwlth. 2020).

The School District appealed, and we granted allocatur with respect to two issues. First, we agreed to consider whether student disciplinary procedures can violate the due process rights of an accused student where the Public School Code does not authorize the use of subpoenas to compel witnesses, including student victims, to testify. We also agreed to address whether our decision in *Knox* modified the First Amendment analytical framework applicable to public school student discipline proceedings where the speech

---

[8] The trial court additionally found that the Cyberbullying Policy only applied to "a school setting," and, as the communication between J.S. and Student One occurred in their own homes, on their own time, and on their own devices, the cyberbullying violation could not be sustained. Trial Court Opinion, 2/25/2019, at 38. This finding is not at issue before us.

at issue involved a threatened school shooting or caused a substantial disruption. *J.S. v. Manheim Township School District*, 243 A.3d 971, 972 (Pa. 2021) (order).[9] [10]

---

[9] Specifically, we granted allowance of appeal of the following two issues, as stated by the School District:

> (1) Whether, after concluding the *Knox* "true-threat" framework and "contextual subjective analysis" was required, the Commonwealth Court erred in concluding the longstanding Pennsylvania Department of Education procedures for student disciplinary procedures, which codify *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) in the Pennsylvania Administrative Code, violate the Constitutional due process rights of an accused student because the Public School Code does not empower school districts to issue subpoenas to compel witnesses, including student victims, to testify subject to cross-examination, and a school district cannot otherwise perform the required "contextual subjective analysis" required by the *Knox* "true threat" framework absent evidence of the victims' or listeners' understanding of the speech.

> (2) Whether the Commonwealth Court erred by misapplying *Commonwealth v. Knox*, 647 Pa. 593, 190 A.3d 1146 (2018) to modify the substantial disruption test provided by *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) and used in *J.S. v. Bethlehem Area School District*, 794 A.2d 936 (Pa. 2002) as part of the First Amendment analytical framework applicable to public school student discipline proceedings where the speech at issue involved a threatened school shooting and caused a substantial disruption including distress and alarm to students, a district-wide response, and police involvement, but was made from a private electronic device, at home, and outside of school hours by adopting the "true threat" framework and requiring the school to conduct the "contextual subjective analysis" necessary to criminally prosecute speech under *Knox*.

*Id.*

[10] As expressed in his concurring opinion, Justice Saylor would resolve this matter through an interpretation of Section 510 of the Public School Code, 24 P.S. § 5-510, an approach not advocated by either party before us, or one extensively analyzed by the trial court. Alternatively, Justice Saylor would consider the sufficiency of the evidence under the School District's policies as set forth in its manual. As he did before the trial court,

While we granted allocatur on two issues, we believe it prudent to resolve this appeal only on the First Amendment question, and thus we do not address the due process question (or the statutory question regarding the authority to issue subpoenas nested therein) regarding a school district's ability to compel a student's attendance at an expulsion hearing. Specifically, if we were to find that J.S.'s due process rights were not violated, we would still have to determine whether the memes were protected under the First Amendment. Likewise, if we were to find the School District did violate J.S.'s due process rights, there would be the theoretical possibility of a remand, and so we would still have to address the First Amendment question, as it would potentially moot such remand. Second, the School District and *amicus* Pennsylvania School Boards Association ("SBA") disagree about whether a school district has the ability, under the Pennsylvania School Code, to compel the testimony of a student at an expulsion hearing — an integral part of the due process analysis. The School District claims that it does not have statutory or inherent authority to compel student testimony, *see, e.g.,* Appellant's Brief at 32, while the SBA maintains school boards do have that power. Pennsylvania School Boards Association's Brief at 7-16 (citing to 24 P.S. § 11-1128). Thus, the two entities ostensibly representing our Commonwealth's schools are not in alignment on the implicated subpoena issue. Therefore, for the above reasons, we will address only the question of whether our decision in *Knox* modified the First Amendment analytical framework applicable to public school student discipline proceedings and whether J.S.'s

J.S., as appellee before our Court, likewise attempts to limit the focus of the appeal to evidentiary sufficiency. However, the trial court considered, and we granted allocatur on, the broader and more consequential constitutional question of, *inter alia*, the applicability of *Knox* to the true threat and substantial disruption construct as employed by *Tinker* and *Bethlehem Area School District*. Thus, while we do not necessarily disagree with Justice Saylor's sufficiency analysis, we respectfully conclude that we should resolve the First Amendment question on which we granted allocatur, one which is of far greater statewide import than the sufficiency of the evidence under one school district's policy manual.

speech constituted a true threat or caused a substantial disruption of the school environment.[11]

The School District takes the position that the true threat analysis is different in the school context, eschewing the First Amendment framework for criminally prosecuting threatening speech as an appropriate standard for regulating threatening student speech. Specifically, the School District contends that a two-prong inquiry should determine whether a school's punishment violates a student's First Amendment rights: (1) whether the student speech constitutes categorically unprotected speech (i.e., a true threat), and if not, (2) whether the restriction or punishment is nonetheless justified because the student speech caused, or would foreseeably cause, a substantial disruption with school activities. The School District asserts that "[i]t is unnecessary, however, for school districts to prove a true threat at all, much less by the subjective contextual analysis set forth in *Knox,* to punish student speech." Appellant's Brief at 31. Related thereto, and as to the first prong, the School District argues that the lower tribunals improperly used the subjective criminal intent analysis of *Knox*, displacing the objective standard set forth in *Bethlehem Area School District.* This, according to the School District, disregards the unique educational environment, and "strips schools of the ability to balance the First Amendment rights of students against the rights of other students to an enriching and safe learning environment," *id.* at 40, through the prohibition of the use of vulgar, offensive, or threatening speech in the school environment, *id.* at 43.

---

[11] The question of the proper analysis to be employed in discerning whether speech constitutes a true threat is a pure question of law, for which our standard of review is *de novo*, and our scope of review is plenary. The question of whether a statement constitutes a true threat is a mixed question of law and fact, to which we defer to the properly supported factual determinations of the fact finder, but resolve any legal questions *de novo. Knox*, 190 A.3d at 1152.

The School District posits that, under an objective standard, various factors must be considered, including the context of the statement, the reaction of the listeners and others, and the nature of the comments. It claims this standard best accommodates the special character of public schools, as well as the less formal nature of student disciplinary proceedings which lack the full panoply of protections afforded criminal defendants. According to the School District, the subjective intent of the speaker is not relevant in determining whether a statement is a true threat, and insists that *Knox* did not preclude application of an objective standard in student speech cases, as set forth in *Bethlehem Area School District*. The School District maintains that an objective true threat analysis does not require the testimony of the alleged victim, and claims that, under a subjective intent standard, a threat which does not identify any victim would make it impossible to satisfy *Knox*. Thus, according to the School District, the proper test assesses whether a reasonable person in the student's position would foresee that his statement would be interpreted as a serious expression of intent to harm, citing *Bethlehem Area School District*. Moreover, the School District further warns that reviewing courts should not act as a "super school board." *Id.* at 49.

Applying this test, the School District submits that J.S.'s statements constituted a true threat, as they came on the heels of the recent Parkland, Florida shooting. The School District offers that "any reasonable person making J.S.'s unequivocal, unconditional, and specific threat to shoot up the school that week would foresee that the statement would be interpreted as a serious expression of intent to harm or assault." *Id.* at 50.

The School District continues that, even if J.S.'s statements were not true threats, it was justified in punishing him under *Tinker*, because his speech caused a substantial disruption in the school. Initially, the School District rejects any territorial limitation on its

ability to act as untenable, and offers that, although the speech was not made during school hours or on school grounds, there was a sufficient nexus to the school and disruption to justify discipline, citing cases upholding disciplinary action for threats of violence on Facebook, YouTube, and MySpace, and via Instant Messaging. Related thereto, the School District contends that, even if *Knox* is pertinent in evaluating student speech, its application is limited to whether the speech constitutes a true threat. The School District argues that, even if not a truth threat, J.S.'s messages caused material and significant disruption, including "wide concern for student safety and a heightened police presence at the school." *Id.* at 58. According to the School District, Student One and Student Two lost educational time, and the campus "was abuzz" regarding the Snapchat posts, unsurprising given that the memes were sent less than two months after the Parkland, Florida school shooting. *Id.* Finally, the School District offers that it had to spend time investigating the messages, diverting time and resources, and interrupting the education of other students.[12]

In response, J.S. asserts that the subjective intent standard articulated in *Knox* is equally applicable in both the criminal and civil contexts. As offered by J.S., if there is no true threat, then there is no justification to expel J.S., *i.e.*, no justification to deprive him of a liberty or property interest in public education. J.S. explains that *Knox* and *Bethlehem Area School District* both use a contextual analysis that does not rigidly distinguish between civil and criminal law, and points to Justice Wecht's concurring and dissenting view in *Knox* that its analysis applies in the civil context, as the central element in a true threat determination is the speaker's state of mind. J.S. asserts that this makes sense

---

[12] *Amicus* SBA, in support of the School District, asserts that the lower tribunals erred in rejecting the off-campus misconduct test set forth in *Bethlehem Area School District* for the reasons stated by the School District, but points to the then-pending appeal before the United States Supreme Court involving off-campus speech in *Mahanoy Area School District v. B.L.*, 141 S.Ct. 2038 (June 23, 2021), which we discuss below.

because many factors such as age, background, occupation, facility with grammar, and other variables come into play in determining intent. J.S. continues that other considerations such as whether the speech is on the internet (where the speaker cannot control the extent of the speech), or whether the speech is verbal (with intonation, tone of voice, and eye contact all conveying meaning), could impact what is intended and what a recipient understands. J.S. adds that it is particularly difficult to infer meaning from words by themselves when used as part of an artistic creation, or to communicate jest, satire, humor, or hyperbole. Thus, according to J.S., a true threat is a serious expression of a subjective intent to commit an act of unlawful violence to a particular individual or group.

Finally, J.S. takes issue with the School District's contention that *Tinker* allows speech to be punished even if it is off-campus, if it created a substantial disruption. In any event, J.S. submits that the School District never asserted a *Tinker*-type violation. Additionally, J.S. argues that because the School District failed to establish that J.S. intended to threaten Student One, and failed to establish that anyone was terrorized by J.S.'s memes, and because the memes had no nexus to the school, there could be no substantial disruption as defined by *Tinker*. Furthermore, J.S. rejects the School District's assertion that the lower tribunals created a new *Tinker* standard based upon *Knox*, contending that the lower tribunals' *Tinker* analysis was independent of any *Knox* true threat analysis.

Applying *Tinker*, J.S. maintains that the lower tribunals properly found there was no direct nexus to the school. Related thereto, even if the School District could establish a school nexus, J.S. points out that the disruption was not substantial, and that any disruption was due to the School District's announcement to the school community and the media about the threat. While J.S. agrees that the School District was required to

investigate the allegations of a threat, the investigation by itself was insufficient to satisfy *Tinker*'s substantial disruption test. Ultimately, J.S. argues that, as a matter of law, there was no substantial disruption, let alone one severe enough to authorize the school to punish J.S.'s off-campus speech.[13]

A brief overview of the First Amendment and its jurisprudence is helpful to our analysis of this matter. The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The First Amendment and its protections apply to Pennsylvania state action through the Fourteenth Amendment. U.S. Const. amend. XIV; *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907 (1982). The First Amendment promises that the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (quoting *Bolger v. Youngs Drug Products Corporation*, 463 U.S. 60, 65 (1983)).

However, despite the clear command of the First Amendment's protections against governmental interference, the United States Supreme Court has long recognized that federal and state officials may regulate, or even prohibit, certain types of speech. As

---

[13] *Amicus* American Civil Liberties Union of Pennsylvania ("ACLU"), in support of J.S., urges our Court to adopt a subjective speaker-based standard for determining whether a statement constitutes a true threat. It maintains that allowing punishment of speech without regard to the speaker's intent could punish protected speech. Related thereto, the ACLU warns that speech may be crudely or zealously expressed or taken out of context. The ACLU offers that this is especially true with respect to online speech, which may be decontextualized by third parties with whom the speaker has no connection. The ACLU adds that an objective standard may also prohibit speech that serves as a safety valve or a vehicle for cathartic release. Indeed, the ACLU suggests that the adolescent students here were processing their fears about school shootings by poking fun at those fears. Under *Tinker*, authorities may punish student speech that leads to, or might lead to, a substantial disruption; but, according to the ACLU, such speech must be limited to that expressed in the school environment. Finally, the ACLU warns that expanding *Tinker* to off-campus speech will exacerbate racial and other disparities, as, according to the ACLU, black, disabled, and LGBTQ+ students are disproportionately disciplined and removed from the classroom.

noted in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942), restrictions on speech are permissible where the speech is "of such slight social value as a step to truth that any benefit that may be derived from [it] is clearly outweighed by the social interest in order and morality."  Since *Chaplinsky*, the Supreme Court has both narrowed and expanded the classes of speech left unprotected by the First Amendment.  Indeed, through the years, the United States Supreme Court has identified certain types of speech that are beyond the First Amendment's protections.  These include speech intended to incite imminent lawlessness, obscenity, defamation, speech integral to criminal conduct, fighting words, child pornography, fraud, and true threats.  *See, e.g., United States v. Alvarez*, 567 U.S. 709, 717 (2012); *see generally*, Emily Gold Waldman, *Regulating Student Speech: Suppression Versus Punishment*, 85 Ind. L.J. 1113, 1119 n.46 (2010) (citation omitted).  That said, although great changes have occurred in the format and type of speech and communication, and will no doubt continue to occur, the First Amendment's core principles remain steadfast, even for cyber speech and other speech aided by computer technology.  *Brown v. Entertainment Merchants Association*, 564 U.S. 786, 790 (2011) ("[W]hatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears." (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952))); *see generally* Trae Havens, *The First Amendment Has Entered the Chat: Oklahoma's Cyberharassment Law*, 73 Okla. L. Rev. 401, 403–04 (2021).

In this appeal, we consider the "true threat" exception to free speech protections. Threats of violence are deemed to fall outside of the First Amendment's shield so as to "protect[ ] individuals from the fear of violence, from the disruption that fear engenders,

and from the possibility that the threatened violence will occur." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992).

We begin our decisional analysis with the United States Supreme Court's seminal 1969 decision in *Watts v. United States*, 394 U.S. 705 (1969), which first recognized the true threat doctrine. The case arose in the context of statements made by 18-year-old Robert Watts during a discussion group in Washington D.C. regarding the military draft at the time of the Vietnam War. Watts declared, in relevant part, that "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Id.* at 706. After Watts was convicted under a federal statute criminalizing threats to the President, ultimately, the United States Supreme Court reviewed the conviction, and in doing so explained that, before the statute could be applied to punish a speaker, the government had to prove that such speech was a "true threat." That is, Watts' conviction could only be upheld if his words conveyed an actual threat, and not merely political hyperbole. In analyzing this question, the Court did not set forth a bright-line test for evaluating when speech constitutes a true threat, and thus outside the scope of the First Amendment's protections. The Court suggested that certain factors, however, were important to evaluating the protection accorded to threatening expression, including the context of the expression, the reaction of the listeners, and the conditionality of any threat, as well as the context and background circumstances of the expression. After considering the full context of Watts' statement – including that the words were uttered during a political debate, that the alleged threat was conditional, and the audience's reaction – the high Court concluded that Watts' statement could only be reasonably interpreted as an expression of political dissent, and not a true threat.

Our Court addressed the true threat paradigm in the school context in our 2002 decision in *Bethlehem Area School District*. In that case, an eighth-grade student in the

Bethlehem Area School District created a website on his home computer and uploaded it to the internet. The website, "Teacher Sux," was not related to any school program, assignment, or project. *Bethlehem Area School District*, 807 A.2d at 850-51. When a person accessed the website, the front page consisted of a "disclaimer," which informed the viewer that, by clicking through and entering the website, the viewer agreed: (1) not to report to anyone affiliated with the school district what the viewer was about to see; (2) that the viewer was not an employee of the district; and (3) that the viewer would not disclose to anyone the identity of the creator of the website and would not "cause trouble" for the creator. While styled as a disclaimer, the front page did not actually bar access to anyone and was not password-protected. *Id.* at 851. The primary pages of the website contained derogatory, profane, and threatening statements directed primarily at the principal of the middle school, and at the student's algebra teacher, Kathleen Fulmer. One page, *inter alia*, was entitled "Why Fulmer Should be Fired," which set forth in degrading terms that, because of her physique and her disposition, Mrs. Fulmer should be terminated from her employment. Another animated web page contained a picture of Mrs. Fulmer with images of characters from the cartoon "South Park" and the statement, "That's right Kyle [a South Park character]. She's a bigger b____ than your mom." Yet another web page morphed a picture of Mrs. Fulmer's face into that of Adolph Hitler and stated "The new Fulmer Hitler movie. The similarities astound me." Perhaps most noteworthy, however, one page was captioned, "Why Should She Die?", and included a request for money for a hitman. Below the statement questioning why Mrs. Fulmer should die, the page offered "Some Words from the writer" and listed 136 times "F___ You Mrs. Fulmer. You Are A B___. You Are A Stupid B___." *Id.* at 851.[14] Another page set forth

---

[14] The opinion used blanks, "rather than the actual profane words that were spelled out in the web site." *Id.* at n.3.

a diminutive drawing of Mrs. Fulmer with her head cut off and blood dripping from her neck. *Id.* at 851. Unfortunately, Mrs. Fulmer became concerned for her safety and experienced physical maladies due to which she was unable to finish the school year, and was afforded medical leave for the following school year. *Id.* at 852.

In analyzing whether the student's website constituted a true threat, we employed an objective reasonable person approach, inquiring whether the speaker would reasonably foresee that the statement would be interpreted as a serious expression of purpose or intent to inflict harm. After reviewing relevant case law, we held that, to determine whether a statement is "a serious expression of intent to inflict harm," Pennsylvania courts must "consider the statements, the context in which they were made, the reaction of listeners and others as well as the nature of the comments." *Id.* at 858.

Our Court initially determined that, because the student accessed the website at school and aimed it at a specific audience of students as well as others connected with the school, it was on-campus speech for purposes of punishment. We then considered the "statements, the context in which they were made, the reaction of listeners and others as well as the nature of the comments." *Id.* Applying these factors, our Court found that the student's statements were not true threats. We acknowledged, *inter alia*, that the statements and images on the website were not conditional, and that they significantly impaired Mrs. Fulmer's well-being and career. Nevertheless, we found it important that the threatening statements were not communicated directly to Mrs. Fulmer. To the contrary, the "disclaimer" indicated that the student did not want school faculty to view the material on the site. Moreover, there were no indications that the student had made other threatening statements to Mrs. Fulmer, and it was "unclear if Mrs. Fulmer had any reason to believe that [the student] had the propensity to engage in violence, more than any other student of his age." *Id.* at 859.

Cognizant of the limited nature of the exceptions to free speech protections and the criminal nature of a true threat analysis, our Court found that, under the totality of the circumstances, the website, "taken as a whole, was a sophomoric, crude, highly offensive and perhaps misguided attempt at humor or parody. However, it did not reflect a serious expression of intent to inflict harm." *Id.*

Nonetheless, our Court turned to the independent question of whether the website created a substantial disruption to the school environment, citing *Tinker.* Ultimately, we concluded that it did, because it adversely and directly affected the entire school community, resulting in emotional and physical injuries to Mrs. Fulmer, her absence from the remainder of the school year, and her taking medical leave for the following year. Students not only expressed anxiety, but visited school counselors. Finally, among teachers and students there was a feeling of "helplessness and low morale" akin to an atmosphere that a student had died. *Id.* at 869. Thus, our Court concluded that the website significantly and adversely impacted the delivery of instruction, creating a substantial interference with the work of the school sufficient to satisfy *Tinker.*

Sixteen years after our decision in *Bethlehem Area School District*, our Court again revisited the area of First Amendment protections for true threats in *Knox.* In the years between our decision in *Bethlehem Area School District* and *Knox*, however, a split United States Supreme Court in *Virginia v. Black*, 538 U.S. 343 (2003), analyzed a Virginia statute that criminalized the burning of a cross in public or on another's property with the intent to intimidate, and included a presumption of an intent to intimidate a person or group of persons. The *Black* Court, in addressing the concept of true threats, rejected the statutory presumption that cross burning implied an intent to intimidate. In doing so, however, the Court did not definitively answer whether the speaker's subjective intent was relevant for determining whether a statement or action constituted a true threat.

In *Knox*, our Court answered this open question. In that decision, Jamal Knox was charged with multiple offenses after a routine traffic stop, and, while the charges were pending, he "wrote and recorded a rap song entitled, 'F__k the Police.'" *Knox*, 190 A.3d at 1149.[15] Ultimately, the song was uploaded to YouTube, and the link was posted on a public Facebook page, including lyrics describing killing Pittsburgh police officers and informants and specifically referred to "Officer Zeltner" and "Mr. Kosko," two members of the Pittsburgh police force who had participated in Knox's arrest and were scheduled to testify against him. Knox was arrested and charged with two counts of terroristic threats[16] and witness intimidation.

In determining whether the lyrics constituted protected free speech or a true threat, our Court, based upon its reading of *Black*, determined that "an objective, reasonable-listener standard, such as that used in [*Bethlehem Area School District*] is no longer viable for purposes of a criminal prosecution pursuant to a general anti-threat enactment" and that the First Amendment required an inquiry into the speaker's mental state. *Id.* at 1156-

---

[15] As in *Bethlehem Area School District*, the Court used blanks rather than the express words of the title.

[16] 18 Pa.C.S. § 2706. Section 2706 provides, in relevant part:

> (a) Offense defined.--A person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to:
>
> (1) commit any crime of violence with intent to terrorize another;
>
> (2) cause evacuation of a building, place of assembly or facility of public transportation; or
>
> (3) otherwise cause serious public inconvenience, or cause terror or serious public inconvenience with reckless disregard of the risk of causing such terror or inconvenience.

57.[17]  The *Knox* Court concluded that the United States Constitution permitted states to criminalize threatening speech which was intended to terrorize and intimidate, and that, in considering whether the speaker acted with the requisite intent, weight was to be given to the contextual circumstances such as those offered in *Watts* and *Bethlehem Area School District. Id.* at 1158-59.

Having found that true threat doctrine requires the speaker to have acted with an intent to terrorize or intimidate, we then examined the contextual circumstances of Knox's song.  Our Court reviewed the lyrics, finding that the song did not merely speak to grievances about the police community or include merely political or social opinion, but threatened violence *toward* the police, including personalized, specific threats.  We highlighted that Knox not only mentioned Detective Zeltner and Officer Kosko by name, but also referenced when the officers' shifts ended, thus, personalizing the threat.  Additionally, our Court determined that Knox was motivated by his recent arrest and Officer Kosko's confiscation of Knox's cash.  Finally, the court noted that the soundtrack included bull horns, police sirens, and sounds of firearms, giving the aura of a threat.

Further, our Court found that the threats were largely unconditional and that, due to the song, the officers were concerned for their safety.  We also held that the officers reasonably believed that Knox might engage in violence, as a loaded weapon was found in Knox's car.  Although Knox did not send the video to the officers, our Court determined that there was no intention suggesting that the song should not be conveyed to the police

---

[17] The question of whether the First Amendment allows for the criminalization of threats made in reckless disregard of causing fear was left open in *Knox. Id.* at 1157 n.10.  That question is currently pending before our Court in *In the Interest of J.J.M.*, 23 MAP 2020.  The answer does not affect our resolution of this matter, however, as the trial court found the School District made no findings or conclusions concerning J.S. in this regard, and, in any event, as noted below, we find that J.S. did not act in reckless disregard of the risk of causing terror.

once it had been uploaded. Thus, our Court concluded that, based upon these factors, Knox intended to convey a true threat.

Critically, however, our true threat analysis was in the context of a criminal statute, and did not address speech that arose in the school setting. Indeed, Justice Wecht, in his concurring and dissenting opinion in *Knox*, offered that, as the test articulated in *Bethlehem Area School District* predated *Black*, a "complete and final" modification of the true threat test was necessary. *Knox*, 190 A.3d at 1162 (Wecht, J., concurring and dissenting). Justice Wecht, in percipient fashion, offered that the true threat framework transcended criminal matters, and would extend to "a school district faced with the possibility of punishing (and possibly expelling) a student who has created a tasteless website or made derogatory and potentially threatening comments on social media." *Id.* For his part, Justice Wecht offered a two-part test for assessing true threats. Justice Wecht would initially employ an objective analysis to determine whether reasonable listeners would view the statement to be "'a serious expression of intent to inflict harm,' and not merely jest, hyperbole, or a steam valve." *Id.* at 1165 (*quoting Bethlehem Area School District*, 807 A.2d at 858). Justice Wecht found the factors considered in *Bethlehem Area School District* to be apt and beneficial, including "the statements, the context in which they were made, the reaction of the listeners and others as well as the nature of the comments." *Id.* (quoting *Bethlehem Area School District*, 807 A.2d at 858). Justice Wecht offered that "[n]o one factor should be considered conclusive, and each should be considered and analyzed, alone and against the others, under the totality of the circumstances." *Id.* If the first prong was satisfied, Justice Wecht suggested a court should then engage in a subjective analysis to ascertain whether the speaker specifically intended to intimidate the victim, or intended his expression to be received as a threat to the victim. *Id.* Justice Wecht opined that a failure to "satisfy either prong would mean

that, under the First Amendment, the statement cannot be penalized or proscribed." *Id.* Applying this two-pronged approach, Justice Wecht determined that the First Amendment did not immunize Knox's rap song from prosecution, and his lyrics constituted a true threat.

As our decision in *Knox* considered a true threat only in the criminal realm, and not in the distinct context of public schools, we next turn to case law involving student speech. Generally speaking, "minors are entitled to a significant measure of First Amendment protection." *Brown v. Entertainment Merchants Association*, 564 U.S. 786, 794 (2011). However, "the First Amendment rights of students in the public schools 'are not automatically coextensive with the rights of adults in other settings.'" *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (citation and internal quotation marks omitted).

The foundational decision concerning student speech can be found in *Tinker*, *supra*. In *Tinker*, students were punished for wearing black armbands to school as a protest against the Vietnam War. In its oft-quoted passage, the *Tinker* Court determined that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years." *Tinker*, 393 U.S. at 506. The high Court acknowledged that it had stressed the authority of schools, consistent with fundamental constitutional safeguards, to dictate and control conduct in the schools. But it found itself addressing the intersection of student First Amendment rights – akin to "pure speech" – and the rules of the school authorities. *Id.* at 507-08. Ultimately, the Court reasoned that, for a school to prohibit a particular expression, it was required to demonstrate that its action was driven by more

than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint, but that the forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Id.* at 509. In the intervening 50 years, the high Court has only on a few occasions spoken to the contours of student speech protections.

The United States Supreme Court's most recent decision in *Mahanoy Area School District, v. B.L.*, 141 S.Ct. 2038 (2021), while not involving true threats, highlights the limited precedent in the area of student speech, and provides a useful, if not definitive, framework, at least on a broad scale, regarding the outer boundaries of its prior student speech precedents and, specifically, the on-campus versus off-campus speech distinction. In *Mahanoy*, while at a local convenience store, high school student B.L. sent a message via social media platform Snapchat from her cellphone to select friends, knowing it would disappear in 24 hours. The message, which was made outside of school hours and away from the school's campus, expressed her frustration that she would not advance to Mahanoy Area High School's varsity cheer squad as a rising sophomore. Specifically, "[t]he first image B.L. posted showed B.L. and a friend with middle fingers raised; it bore the caption: 'Fuck school fuck softball fuck cheer fuck everything.' The second image was blank but for a caption." *Id.* at 2043. Other students took screenshots of the two Snapchat photos and shared them with other members of the cheerleading squad. *Id.* The photos eventually reached the school principal and cheerleading coaches, who "decided that because the posts used profanity in connection with a school extracurricular activity, they violated team and school rules. As a result, the coaches suspended B.L. from the junior varsity cheerleading squad." *Id.*

After unsuccessfully seeking to reverse that punishment, B.L. and her parents sought relief in federal court, arguing, *inter alia*, that punishing the student violated the

First Amendment. The United States District Court granted summary judgment to B.L., explaining that her suspension was not justified under *Tinker* because the school did not show that B.L.'s speech caused or increased the likelihood of a substantial disruption. On appeal, the Third Circuit Court of Appeals affirmed, but it did so on that basis that *Tinker* did not apply to student speech that does not take place on school premises.

In an 8-1 opinion, the United States Supreme Court, albeit by varied rationales, affirmed. Specifically, Justice Stephen Breyer, writing for the majority, initially reaffirmed the Court's holding in *Tinker* that students do not "shed their constitutional rights to freedom of speech or expression," even "at the schoolhouse gate," *Tinker*, 393 U.S. at 506, but that courts must apply the First Amendment "in light of the special characteristics of the school environment," including that schools at times stand "*in loco parentis*, *i.e.*, in the place of parents." *Mahanoy*, 141 S.Ct. at 2044-45 (citations omitted).

The Court continued, offering that, in addition to the special interest schools have in regulating speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others" — characteristics identified by the Court in *Tinker*, 393 U.S. at 513 — schools may sometimes regulate: (1) "indecent," "lewd" or "vulgar" speech spoken at a school assembly on school premises, citing *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986); (2) speech that can be interpreted as school-sanctioned, such as material in a school newspaper, citing *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988); and (3) speech that encourages "illegal drug use," citing *Morse v. Frederick*, 551 U.S. 393 (2007). *Mahanoy*, 141 S.Ct. at 2045.

In answering the lingering issue regarding the regulation of off-campus speech, the high Court determined that a school's regulatory interests "remain significant" in some behavior that occurs off campus. *Id.* Importantly for the appeal *sub judice*, the Court mentioned "serious or severe bullying" and threats against teachers or students as

examples of when a school has an interest in regulating off-campus speech, as well as "the failure to follow rules concerning lessons, the writing of papers, the use of computers, or participation in other online school activities; and breaches of school security devices, including material maintained within school computers." *Id.* Thus, the Court found that the lower court drew too rigid a line by concluding that *Tinker*, which lets schools regulate student speech that substantially disrupts school operations or invades others' rights, did not apply to off-campus speech.

However, the majority declined to establish a uniform rule for monitoring off-campus speech, or a list of activities that a school may regulate, given variables such as "a student's age, the nature of the school's off-campus activity, or the impact upon the school itself." *Id.* The Court instead emphasized three features of off-campus speech that would work against a school's special interests in regulating a student's speech: (1) off-campus speech generally occurs when the school is not responsible for the student, but parents are; (2) from the student speaker's point of view, regulating a student's off-campus speech could cover the student's speech for the entire day, so skepticism of regulation is warranted; and (3) public schools are the "nurseries of democracy," so schools have an interest in protecting the "marketplace of ideas," including "unpopular ideas." *Id.* at 2046. According to the high Court, these three features suggest the diminished, but not eliminated, ability of schools to regulate off campus speech. The Court left for "future cases to decide where, when, and how these features mean the speaker's off-campus location will make a critical difference." *Id.*

Applying these concepts, the majority in *Mahanoy* noted that, while B.L.'s speech was vulgar, it was not outside First Amendment protections, and equated it to the type of criticism the First Amendment would protect if B.L. were an adult. Further, the majority emphasized that the speech was outside of school hours, did not identify the school or

target an individual in the school community, and that B.L. conveyed her speech through a personal cell phone to a private group of Snapchat friends. *Id.* at 2047.

The majority then weighed B.L.'s free speech interest against the "school's interest in teaching good manners and consequently in punishing the use of vulgar language aimed at part of the school community." *Id.* It explained that the school's interest in teaching manners or disciplining her for using vulgar language – where B.L. spoke off-campus on her own time, and where the school did not stand *in loco parentis* – did not "overcome B.L.'s interest in free expression." *Id.* Turning to *Tinker*'s substantial disruption analysis, the majority offered that certain "upset" cheerleaders, or discussions of an issue for "5 to 10 minutes of an Algebra class 'for just a couple of days'," did not amount to a "substantial disruption" that might warrant discipline under the standard in *Tinker*. *Id.* at 2047-48. Thus, the Court concluded that the disturbance generated by B.L.'s speech did "not meet *Tinker*'s demanding standard." *Id.* at 2048. Finally, in rejecting the school district's concern for "team morale," the Court found no serious decline in such morale to the point that it would substantially interfere with or disrupt team cohesion. *Id.* Finally, the Court cautioned, "[i]t might be tempting to dismiss B.L.'s words as unworthy of the robust First Amendment protections discussed herein. But sometimes it is necessary to protect the superfluous in order to preserve the necessary." *Id.*[18]

---

[18] Interestingly, Justice Samuel Alito in concurrence, joined by Justice Neil Gorsuch, posited the question, "[w]hy does the First Amendment ever allow the free-speech rights of public school students to be restricted to a greater extent than the rights of other juveniles who do not attend a public school?" *Id.* at 2049-50 (Alito, J., concurring). The answer, as offered by Justice Alito, is partly found in *Tinker*, which recognized that a public school is acting as an arm of the state in which it is located, and the fact that no school could properly function if teachers and administrators lacked the ability to regulate on-campus speech. *Tinker*, 393 U.S. at 509; *see also Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 279 (1988) (Brennan, J., dissenting) ("The young polemic who stands on a soapbox during calculus class to deliver an eloquent political diatribe interferes with the legitimate teaching of calculus."). Yet, attempting to justify a school in regulating not only in-school speech, but speech that is not communicated on school

Thus, in *Mahanoy*, the Court plainly rejected the notion that schools may not regulate off-campus speech. While the Court offered certain features that may diminish the ability of a school to punish off-campus speech, it declined to set forth any list of circumstances in which a school could regulate such speech, or even what constituted off-campus speech, but strongly suggested any such analysis was circumstance specific.

As is apparent from the above, the high Court has yet to develop a comprehensive test detailing what constitutes a true threat, and what speech may be regulated by a school when it occurs off-campus. While such a test is elusive, lower federal courts and state courts, including our Court, have attempted to formulate more definite factors to fill the jurisprudential void in this area, and we continue to do so today. Based upon the First Amendment and decisional authority interpreting that constitutional provision, we adopt the following approach to be used in determining whether a student's speech constitutes a true threat, thus removing it from the protection of the First Amendment.

First, we recognize that the First Amendment provides protections for our citizenry, including minors and students, and generally prohibits content-based restraints, subject to limited exceptions. True threats are one such exception. True threats encompass statements where the speaker means to communicate a serious expression of an intent

___

grounds or as part of a school program, Justice Alito offered that the only "plausible answer" is either express or implied consent, through the common law doctrine of *in loco parentis*. *Mahanoy*, 141 S.Ct. at 2050-51 (Alito, J., concurring); *see also id*. at 2059 (Thomas, J., dissenting) (explaining, for the same reason, the historical authority of schools – albeit with less authority after a student returned home – to discipline students for off-campus speech or conduct that had a tendency to harm the school environment). Our Court, albeit without analysis and in the on-campus setting, has acknowledged a school's authority to regulate speech based upon this doctrine. *Bethlehem Area School District*, 807 A.2d at 860 ("There is a tension between the constitutional rights of schoolchildren and the school's need for order and an educational environment that is safe, structured and conducive to learning. There exists an 'obvious concern on the part of parents, and school authorities acting *in loco parentis,* to protect children'." (quoting *Bethel School District,* 478 U.S. at 684)).

to commit an act of unlawful violence to a particular individual or group of individuals. True threats may be prohibited because regulating such speech protects "individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." *R.A.V.*, 505 U.S. at 388. While the true threat doctrine is criminal in nature and was crafted in the criminal context, it has been applied in the school setting. *See*, *e.g.*, *Bethlehem Area School District*.

Noting, as exemplified by this appeal, that there is disagreement over whether an alleged threat should be viewed from the subjective perspective of the speaker, or from the objective perspective of the reasonable listener, we ultimately conclude that a reviewing court, as a matter of overarching principle in the school setting, should assess whether an expression is a true threat analysis by considering the totality of the circumstances. This approach is consistent with the approaches taken in *Watts*, *Bethlehem Area School District*, and *Knox* regarding true threats, and in *Mahanoy*, concerning student speech generally.

Yet, more specifically, and consistent with *Knox*, we find that in considering the totality of the circumstances, the primary focus must be on the subjective intent of the speaker. That is, the inquiry is ultimately driven by whether the speaker intended the communication to be a serious expression of an intent to inflict harm, *i.e.*, intended to intimidate or threaten the recipient of the message.[19] Consideration of additional circumstances surrounding the speech at issue accounts for the special role that schools play in educating our youth in a productive school environment and the need to protect students from harm as well, recognizing students' more limited free speech rights. However, an inquiry driven by the intent of the speaker is necessary so that student

---

[19] We note that the School District's policy at issue in this matter is essentially identical to the criminal statute at issue in *Knox*.

speech is not unduly prohibited. As well, a subjective approach takes into account the unique vagaries presented by a student speaker, including the student's age, maturity, and lack of judgment. This is especially important for off-campus speech, including in the home, where the authority of the school is diminished and parental control is increased. For these reasons, we find unpersuasive the School District's assertion that, due to the unique school environment, a strictly objective standard should govern. In sum, we believe that a totality of the circumstances approach, with primary focus on the intent of the speaker, properly accounts for a school's duty to provide a safe and productive environment; a student's right to the First Amendment's robust speech protections; and parents' rights to raise their children as they deem proper.

Therefore, consistent with the authority cited above, we hold that a reviewing court must engage in a two-part inquiry: first examining the content of the speech, and then assessing relevant contextual factors surrounding the speech. These factors include, but are not limited to: (1) the language employed by the speaker; (2) whether the statement constituted political hyperbole, jest, or satire; (3) whether the speech was of the type that often involves inexact and abusive language; (4) whether the threat was conditional; (5) whether it was communicated directly to the victim; (6) whether the victim had reason to believe the speaker had a propensity to engage in violence; and (7) how the listeners reacted to the speech.[20]

In applying this standard to the case *sub judice*, we first consider the speech itself. Initially, we note that our analysis is complicated by the fact that, rather than a threat by J.S. to harm another, or others, the memes were constructed as a fictional message of a

---

[20] While we embrace *Knox*'s subjective speaker standard as the core of the student true threat analysis, we note that the standard set forth in *Knox* includes certain objective-standard-related criteria as expressed in *Watts* and *Bethlehem Area School District*, which can be accommodated by an overarching totality of the circumstances approach.

third party threatening violence. Specifically, as discussed above, the first meme was a still photograph of Student Two singing into a microphone and is captioned, "I'm shooting up the school this week. I can't take it anymore I'm DONE!" At the bottom of the meme was a photo-shopped image of J.S. wearing large glasses, akin to those worn by the musician Elton John, obviously watching Student Two's "performance." A second meme, a video, depicted Student Two playing guitar before a microphone and was captioned, "IM READY [Student One] AND MANY MORE WILL PERISH IN THIS STORM. I WILL TRY TO TAKE [Student One] ALIVE AND TIE HIM UP AND EAT HIM." This statement was attributed to Student Two, who was singing Cannibal Corpse-like lyrics, and was consistent with the band's use of gory imagery and references to cannibalism.

Thus, while the actual words employed in the memes read in isolation plainly suggested a school shooting and violence, the memes viewed *in toto* did not threaten Student One, or anyone else, but offered only J.S.'s opinion that Student 2 was a potential school shooter due to his penchant for the music of the band Cannibal Corpse, with J.S. pictured as looking on, and, in that way, portraying Student Two as a death metal rock singer.

Additionally, assessing the context, we note that the memes were part of an ongoing dialog between J.S. and Student One. They occurred approximately two months after the horrific killings in Parkland, Florida. However, they were communicated through Snapchat, a private messaging social media application which, as noted above, conveys messages which cannot be accessed from the web, and can only be viewed for a short time. Furthermore, the memes were sent by J.S. using his personal phone, from his home. Consistent with the limited nature of the communication, we discern that J.S.'s intended audience was only Student One, and that the memes were not intended to be shared, as demonstrated by J.S. instructing Student One to take down the meme once

he realized that Student One had communicated it to others. Student One did so, stating it was a "[p]robable false alarm, just something [J.S.] sent me."

Turning to the other factors, we note that the memes did not constitute political hyperbole, but rather ridiculed a fellow student by portraying him as a singer, performing a song about committing violence at the school — an inartful attempt at humor. This kind of sophomoric and misguided humor certainly can involve inexact and abusive language. Additionally, to the extent the memes referenced a threat by Student Two to the school, we concede it was not conditional, but was a generic statement about *Student Two* "shooting up" the school. Turning to whether the threat was directly communicated to the victim, in our view, the memes were plainly mocking a fellow student, to whom the speech was not directed. Thus, the alleged threats were not communicated to any victim. Indeed, the full circumstances surrounding the memes render the contention that the "victim" was Student One pure sophistry. The lack of a direct, indirect, or even implied victim counsels against finding an intent to threaten on the part of J.S.

Finally, to the extent there was a victim, there is no indication that Student One (the only student to whom the message was directed) had reason to believe the speaker, J.S., had a propensity to engage in violence; and, of significance, Student One reacted to the speech by responding "LOL," strongly indicating Student One did not perceive J.S.'s meme to be a threat. Indeed, Student One's subsequent reaction to the memes was not to ask J.S. to stop sending him messages, or to notify his parents, a teacher, or the school administration, but to post the meme to his Snapchat friends.

Ultimately, we believe that, considering the totality of the circumstances, J.S. did not intend to communicate a serious expression of an intent to inflict harm, intimidate, or threaten the recipient of the message. While mean-spirited, sophomoric, inartful, misguided, and crude, in our view, J.S.'s memes were plainly not intended to threaten

Student One, Student Two, or any other person, and they certainly were not perceived as threatening by the sole recipient, Student One, whose mild reactions to the communication further support the conclusion that there was a lack of any intent on the part of J.S. to threaten. In short, our review of the record reveals that J.S.'s memes did not constitute a true threat.[21]

Indeed, J.S.'s memes can be compared to the communication in *Bethlehem Area School District*, wherein we concluded that there was no true threat. Significantly, in that case, we determined that the website depictions described above in greater detail, and which were not limited to private viewers, could not be taken seriously, and we characterized the threats against the student's teacher as a sophomoric, crude, highly offensive and perhaps a (misguided) attempt at humor or parody. Yet, those depictions were arguably more objectionable as they, *inter alia*, compared the teacher to Adolph Hitler, and sought funds to hire a hitman to kill her.

Further sharpening the point, recently, in *A. F. v. Ambridge Area School District,* No. 2:21-CV-1051, 2021 WL 3855900, at *6 (W.D. Pa. filed Aug. 27, 2021), the District Court for the Western District of Pennsylvania found a student's communications to be a true threat where the language at issue was directed, primarily, at one student, and, in contrast to the generic exasperations expressed by the cheerleader in *Mahanoy*, the

---

[21] As noted above, we need not decide whether a reckless disregard of the risk of causing fear is sufficient to find a true threat under the First Amendment, as the trial court determined that the School District made no findings regarding whether J.S. acted with reckless disregard of such risks. Nevertheless, before our Court, the School District contends that its finding of a violation of its Terroristic Threat policy should be upheld because J.S. acted with a reckless disregard of the risk of causing terror. While we agree with the trial court that this basis for expulsion was not argued below, we nevertheless conclude that J.S.'s actions did not constitute such a reckless disregard under the Terroristic Threats/Acts Policy because J.S. used Snapchat, which cannot be accessed from the web and is of limited duration, and his memes were sent through this medium to a single recipient, using his personal phone, from his home.

student threatened to "show up at practice to beat yo ass bitch," to "grab a fucking bottle and bash that shit on your face till I see your brain bitch," to "send you bitch ass to the father," adding, "it ain't gib be stupid when yo ass dead" and "I sincerely wish death upon your soul." These threats were followed by the posting of A.F. with a gun, which was believed at the time to be a real gun. Obviously, such communications lie at the opposite end of the spectrum from those in the matter *sub judice*.

While we conclude that J.S.'s Snapchat memes did not constitute true threats, this does not end our inquiry. As cogently offered by the School District, even if not a true threat, a school may regulate speech and even punish a student, under *Tinker*, for speech that causes or foreseeably could cause a substantial disruption to the school environment. *See also Bethlehem Area School District*, 807 A.2d at 868. Thus, we turn to review this alternative basis for J.S.'s expulsion.

Although the United States Supreme Court's decision in *Tinker* has been subjected to exceptions, as noted above, it remains the seminal case affirming a student's right to free speech in the school setting. While the high Court explained that students enjoy certain First Amendment rights, and that even on-campus authority over student speech is limited, the Court nevertheless recognized that schools may regulate certain conduct. Broadly speaking, the *Tinker* Court recognized that disruption of the work of the school – i.e., the educational process – renders speech punishable. Indeed, the Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker,* 393 U.S. at 507.

Specifically, the *Tinker* Court offered two circumstances in which student speech could be censored: if the speech materially and substantially interfered with, or could be

reasonably forecasted to interfere with, the necessities for discipline in the school; or if it interfered with the rights of others. *Id.* at 513.

The high Court explained, however, that mere "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 508. Consistent therewith, our Court, relying on *Tinker*, has explained that, while there must be more than mild distraction or curiosity caused by the speech, complete chaos is not required in order for a school district to punish student speech. *Bethlehem Area School District*, 807 A.2d at 868-69. Additionally, as noted above, after *Mahanoy*, *Tinker*'s substantial disruption test may apply to off-campus speech, but additional factors – such as consideration of the reduced role of *in loco parentis* authority, the 24/7 nature of off-campus speech regulation, and the school's interest in protecting unpopular expression – have seemingly become part of the substantial disruption calculus. *Mahanoy*, 141 S.Ct. at 2046.

In analyzing whether J.S.'s speech substantially interfered with the school environment or interfered with the rights of others, we consider the "when, where, and how" of J.S.'s communication. *Id.* at 2047. While J.S.'s communications were created outside of school, there is an indirect nexus to the school, as it involved mocking a fellow student, and the suggestion that this student would "shoot up" the school. This nexus counsels strongly in favor of school regulation. *See id.* Yet, diminishing the School District's interest in punishing J.S. is that he communicated his speech via a personal cell phone, through Snapchat, to an intended audience of one. *See id.* While the School District certainly has an interest in preventing bullying or targeting of a fellow student, such interest is weakened by the fact that J.S. communicated off campus and on his own time. *Id.* Moreover, when J.S. spoke, the school did not stand *in loco parentis*, and there

is no suggestion that J.S.'s parents delegated such authority to the school to regulate J.S.'s behavior in their home.

Finally, we consider whether J.S.'s memes materially and substantially interfered with or interfered with the rights of others. *Id.* at 2047-48. In its Adjudication, the School District found that the initial school employee whose son showed him J.S.'s meme found it to be "alarming," and that the campus was "abuzz" regarding J.S.'s Snapchat posts, noting the events occurred less than two months after the Parkland, Florida school shooting. Adjudication of the Manheim Township School District Board of School Directors, 5/10/18, at 3. Additionally, it offered that the memes caused "apprehension" and resulted in an investigation by the administration and local police to determine if the threat was real. *Id.* at 5, 6. Before us, and though not in its Adjudication, the School District adds its concern for student safety and a heightened police presence at the school, that Student One and Student Two lost educational time due to their being interviewed, and that the administration was required to spend time investigating the messages, diverting its time and resources.

While J.S.'s memes no doubt impacted the school environment to some degree, we do not believe that they rose to the level of a substantial disruption required by *Tinker*. Initially, we note that the School District responsibly investigated the possibility of a threat by immediately contacting the police. Upon receipt of law enforcement's investigation and conclusions that J.S. did not present a threat and that it was safe to attend school the next day, however, it was the School District that created a disruption by sending an email to parents that a threat had been received. With respect to the students at school, the interruption was relatively minor, including conversations, concern, and the campus being "abuzz." Importantly, there is no allegation that school was missed, classes or instruction interrupted, or the operation of the school was compromised. Further, while

not part of the Adjudication, the record supports that the School District initially suspended J.S., interviewed Student One and Student Two, and conducted its own investigation. However, we reject the School District's assertion that its investigation, and even the increased police presence at school the following day, without more, constituted a significant disruption of the school environment. Taken to its logical conclusion, under the School District's argument, any off-campus speech which was investigated by a school could be punished as a substantial disruption of the school environment regardless of whether it was protected by the First Amendment.[22] Finally, we note that there was no demonstrable risk to student safety, as confirmed by law enforcement.

In this regard, our decision in *Bethlehem Area School District* is instructive. In that case, as noted above, the web site posted by the student disrupted the entire school community – teachers, students, and parents. The most significant disruption was the direct and indirect emotional impact and injury to Mrs. Fulmer. Aside from the immediate effects on Mrs. Fulmer, she was also unable to complete the school year and took a medical leave of absence the next year, necessitating the use of three substitute teachers, and unquestionably disrupting the delivery of instruction to the students. Moreover, the anxiety expressed by certain students warranted counseling. In sum, the website significantly and adversely impacted the delivery of instruction, satisfying the requirements of *Tinker*. *Bethlehem Area School District*, 807 A.2d at 869. In contrast, J.S.'s memes in the instant case, while impactful to a certain degree, paled in comparison to those exhibited in *Bethlehem Area School District*, and had far less of an impact on the school environment.

---

[22] We note that *Tinker* permits punishment for speech that not only causes an actual substantial disruption of the school environment, but also when such disruption is foreseeable. However, the School District does not argue this latter aspect of *Tinker*.

Considering *Tinker*'s "demanding standard," *Mahanoy*, 141 S.Ct. at 2048, we find that the School District failed to establish that J.S.'s speech caused a substantial disruption, or impacted the rights of others, so as to permit the School District to punish J.S. for his non-threatening off-campus speech. As the speech at issue did not materially disrupt class work, significantly impact the delivery of instruction, or result in administrative burdens, other than the investigation of the matter itself, the impact of the speech, largely brought on by the School District itself, cannot serve as an independent basis to expel J.S. As set forth by Justice Breyer, "sometimes it is necessary to protect the superfluous in order to preserve the necessary." *Id.* (*citing Tyson & Brother v. Banton*, 273 U.S. 418, 447 (1927) (Holmes, J., dissenting)).

In closing, we are fully cognizant of the significant responsibility and difficulties facing school boards, faculty, administrators, and instructors in providing a safe and quality educational experience for our youth, especially in times of great anxiety. We recognize that this charge is compounded by technological developments such as social media, which transcend the geographic boundaries of the school. It is a thankless task for which we are all indebted. As aptly noted by Justice Alito in his concurring opinion in *Mahanoy*, "[t]he overwhelming majority of school administrators, teachers, and coaches are men and women who are deeply dedicated to the best interests of their students, but it is predictable that there will be occasions when some will get carried away, as did the school officials in the case at hand. If today's decision teaches any lesson, it must be that the regulation of many types of off-premises student speech raises serious First Amendment concerns, and school officials should proceed cautiously before venturing into this territory." *Id.* at 2058–59 (Alito, J., concurring).

For the above reasons, we affirm the order of the Commonwealth Court.

Jurisdiction relinquished.

Chief Justice Baer and Justices Donohue and Wecht join the opinion.

Justice Saylor files a concurring opinion in which Justice Mundy joins.

Justice Dougherty files a dissenting opinion.